THE STATE OF KANSAS, *on the relation of John T. Little, Attorney General,* v. THE DODGE CITY, MONTEZUMA & TRINIDAD RAILWAY COMPANY *et al.*

INSOLVENT RAILROAD COMPANY—*Repair of Track, Writ to Compel, Denied.*
Where a railway company, owning a short line of railroad of 26 miles only, is wholly insolvent, and such company has no cars or engines with which to operate it, and no funds or property to be applied for the payment of the expenses of the company or the road, and the use of the road has been abandoned for several months, and the road cannot be operated, except at a great loss, by any corporation or person, not taking into account the repairs of the road and the taxes thereon, the supreme court, having some discretion in the granting of a writ of *mandamus,* will not compel, by a peremptory writ, the railway company to replace or put into repair its track, a part of which has been torn up, as such an order would be useless or futile, and of no public benefit.

## Original Proceeding in Mandamus.

THIS action was commenced in this court on January 4, 1894, to compel *The Dodge City, Montezuma & Trinidad Railway Company* and the other defendants to repair and relay certain portions of the track and roadbed of the railway company, in the counties of Gray and Ford, in this state. It appears from the evidence presented upon the trial, that on May 21, 1887, the Dodge City, Montezuma & Trinidad Railway Company was chartered, to exist 99 years, and organized under the laws of the state, with the declared intention of constructing a line of railway from Dodge City, in this state, to Trinidad, Colo. The Montezuma company, during the year 1888, constructed its line of road from Dodge City in a southwesterly direction to the town of Montezuma, in Gray county, a distance of 26 miles. At no time has the road been extended further. The Montezuma company never equipped its road with cars or engines. From the time of completion of the road until May, 1893, it was operated by the Montezuma company, by an arrangement with the Chicago, Rock Island & Pacific Railway Company, by which the latter com-

pany was to run its trains over the road at a cost of from $18 to $26 per round trip. During the year 1888, all of the capital stock of the company, amounting to 40,000 shares of $50 each, was issued, and A. T. Soule, of Rochester, N. Y., became the owner of 38,000 shares, which he owned until the time of his death, in 1890, since which time his son, Wilson Soule, has been the owner thereof; and Fairview township became the owner of 278 shares of the stock; and the remaining 1,722 shares have been owned and held, from that time until the present, by other individuals. The total receipts from sale of stock by the Montezuma company, from its organization to the present time, are $63,900. Fairview township, in Ford county, through which the road runs, in September, 1888, became the owner of 278 shares of the stock of the Montezuma company, and has ever since been the owner thereof, by issuing its bonds in the sum of $13,900 to the Montezuma company, on the completion of the road through the township, which bonds are outstanding and unpaid. No other aid was furnished the Montezuma company, except donations by citizens of Dodge City in the amount of $800. The company exercised the right of eminent domain along the entire line of its road. The cost of the construction of the road was $266,000. In 1888, the Montezuma company became indebted to A. T. Soule for $194,333.55, which was used in the construction of the road, and afterwards, in 1889, 1890, and 1891, it became further indebted to A. T. Soule and Wilson Soule in the sum of $38,000. These sums of money were furnished at various times, for which the company gave to Soule its 19 promissory notes, aggregating these sums; and, the notes not being paid, on the 7th day of October, 1891, the Montezuma company, to secure the payment of the same to Wilson Soule, gave him its mortgage upon all its property, described as follows:

"All the line of railway owned by the party of the first part which extends from Dodge City, Kas., to Montezuma, Kas., including the roadbed, ties and rails thereon, together with all side tracks, depots and appurtenances thereto in any-

wise appertaining or belonging: To have and to hold the same, together with all and singular the tenements and hereditaments and appurtenances thereunto belonging, or in anywise appertaining, forever."

On the 19th day of January, 1893, by proceedings in the district court of Ford county, Wilson Soule obtained a judgment against the Montezuma company for the amounts secured by the mortgage, and a decree foreclosing the mortgage, and an order for the sale of the property, which order was executed by a receiver appointed by the court. The sale was had on the 5th day of September, 1893, and the defendant E. F. Kellogg, who purchased for the defendant Wilson Soule, became the purchaser; and afterward, on the 20th day of September, 1893, a deed was made by the receiver, under the order of the court, of the property to E. F. Kellogg, who took the same in trust for Wilson Soule, the real purchaser. On the 2d day of December, 1893, Wilson Soule sold the superstructure of the road to the Block-Pollak Iron Company, with the understanding that the Block-Pollak Iron Company would remove the same from the roadbed. In the months of December and January, work being carried on until the 10th of January, the Block-Pollak Iron Company, through its agents and employés, G. T. Wisewell, Harry Benjamin, and others, tore up and removed 16 miles of the superstructure of the road, commencing at Montezuma and extending east to a point two miles within Fairview township, Ford county, since which time no effort has been made to remove the road, except, on January 20, a portion of the spikes on three-fourths of a mile of track were drawn, and on January 25 a large number of teams were hired to haul rails but were not used, and on January 26, 12 men pulled spikes for half the day. No part of the superstructure of the road has ever been repaired. Before any of the road was taken up, about one-third of the ties were in a defective condition, and, if the road were to be used, ought to have been changed at once; the other two-thirds ought to be changed within the next three years. The estimated cost of replacing

one-third of the ties would be $15,000. In taking up the road, the ties were offered for 2 cents each to the farmers for wood; but no buyers were found, and they were left upon the ground.

At the time the road was constructed, five stations were established, namely, Dodge City and Grand View, in Ford county, and Ensign, Macomb, and Montezuma, in Gray county. At that time Montezuma had about 75 inhabited houses, among which were in operation five or six stores, two hotels, two livery stables, one bank, printing office, post office, and other small business. Ensign was a place of about a half dozen houses, including one store and post office. Grand View and Macomb were no towns at that time or afterwards; but a post office was established at Macomb, which, in 1892, was discontinued by the government. In December, 1893, more than half the houses had been removed from Montezuma, and the population had been reduced to less than 25; no business was carried on there except one general store, with post office; and at that time Ensign was deserted, and no business whatever was carried on there except a post office.

The road was operated from September 5, 1888, to October, 1890, by running one train a day a round trip over the road six days each week; and from that time until May, 1893, by running one train a round trip each day for three days each week. The total earnings for the year ending June 30, 1889, were $1,981.28; operating expenses, $5,940.53; making a deficit of $3,959.25. The total freight earnings for the year ending June 30, 1890, $2,011.60; total passenger and mail earnings, $2,463.47; total earnings, $4,475.07; operating expenses, $14,447.49; making a deficit of $9,972.42. Total freight earnings for year ending June 30, 1891, $919.55; passenger and mail earnings, $1,016.56; total earnings, $1,936.11; operating expenses, $8,026.36; making a deficit of $6,090.24. Total earnings for year ending June 30, 1892, were: Freight earnings, $2,590.21; passenger and mail earnings, $959.04; total earnings, $3,549.25; operating expenses, $7,700.67; making a deficit of $4,151.42. Total earnings for year end-

ing June 30, 1893, were: Freight earnings, $4,906.50; passenger and mail earnings, $874.47; total earnings, $5,780.97; operating expenses, $8,024.55; making a deficit of $2,243.58. In operating expenses are included all other expenses incurred by the company in connection with the maintenance and operation of the road except the taxes of 1891 and 1892, which have been on an average $2,800 per year. During the four years of the operation of the road, the total amount [which is included in the expense item] paid to the officers and employés is $12,097.53, making an average of $3,024.38 a year.

The Rock Island company has a branch of its road at Dodge City, and the superintendent of that company testified "that the Rock Island road is better situated to operate the Montezuma road than any other company; and that his company would not take the road as a gift and operate it; that it would cost nearly as much to keep the road in repair to operate it three months of the year as if it were operated all the time, except as to the rails." M. A. Low, the general attorney for the Rock Island company, also testified "that, in his opinion, the Montezuma road could not be operated as an independent line to pay operating expenses, not including taxes, and that the Rock Island company could not operate it so as to make it pay operating expenses, and that his company could not afford to take the road as a gift and operate it for the period of five years." He further testified, "that the Rock Island company had better facilities for operating the road than any other company, and that his company could not keep it in repair and operate it without absolute loss; that the revenues to be derived from the Montezuma road would not pay operating expenses, not taking into account the repairs of the road and taxes."

The testimony of H. R. Nickerson, superintendent of the Atchison company, shows that the cost of maintaining the track of one of the railroads in the western part of the state, under his supervision, and similar to the Montezuma railway, is from $111.31 to $132 per mile each year, and that these

figures are below the actual requirements of proper maintenance.

The proposed offer of 15 business men near Dodge City to operate the railway, if they can acquire it by gift or otherwise, if the track were relaid, is more visionary than practicable. All that they are willing at present to subscribe or offer towards the operation is $3,000. If the road were in the same condition it was before any of the track was torn up, it would cost $15,000 to put it in reasonable order for mere operation, and then cars and engines would have to be purchased, at a large additional expense. Three thousand dollars is an insignificant sum with which to commence the operation of such a road. It appears, further, from the evidence of the representative of these persons, that they might not be willing to operate the road if the loss were $1,000 a year. The evidence conclusively shows that the deficit in the operation of the road was a much larger amount than that, and, therefore, the proposition amounts to little if anything— nothing substantial. There is really no showing made that the public is sufficiently interested in the operation of the road to pay all of the expenses for so doing.

*John T. Little,* attorney general, and *B. F. Milton,* for plaintiff; *Milton Brown,* of counsel.

*Sutton & McGarry,* for defendants.

The opinion of the court was delivered by

HORTON, C. J.: This proceeding has been commenced in this court, not for the purpose of compelling the Dodge City, Montezuma & Trinadad Railway Company or any of the defendants to operate the line of that railway in Ford and Gray counties, or any part thereof, but merely to require the defendants to repair and relay certain portions of the track and road-bed of the railway company. A railway company may be compelled by *mandamus* to perform the public duties specifically and plainly imposed upon the corporation; and, therefore, we have no doubt of the power of this court, in a proper case,

to compel a company to operate its road, and for that purpose to compel the replacement of its track torn up in violation of its charter. ( *The State v. Railway Co.*, 33 Kas. 176; *City of Potwin Place v. Topeka Rly. Co.*, 51 id. 609; *U. P. Rly. Co. v. Hall*, 91 U. S. 343; *Rex v. S. & W. Rld. Co.*, 2 Barn. & Ald. 646.) But the granting of a writ of *mandamus* rests somewhat in the discretion of the court. ( *City of Potwin Place v. Topeka Rly. Co.*, supra.)

The Montezuma railway company is insolvent. It has no cars or engines. Its line of road has not been operated for many months. The road cannot be operated except at a great loss. The railway company is not able to operate it, and has no funds or property which can be applied to the payment of operating expenses. A. T. Soule, the promoter of the railway company, has expended over $200,000 in the construction and operation of the road without any returns. All of its property was sold, or attempted to be sold, to the Block-Pollak company for $25,000 only. The venture of the promoter has been very unsuccessful to him. His experience, and the other parties investing, in constructing and operating this railway has been most unfortunate. No one connected with the railway corporation has realized any personal benefit from any bond, mortgage or subsidy of the road. The Rock Island road, which, by an arrangement with the Montezuma company, ran its trains over the road from the time of its completion until May, 1893, and which has better facilities for operating the road than any other company or person, will not take the road as a gift and operate it. It seems to be conclusively shown that all the receipts to be derived from operating the road will not pay the operating expenses, not taking into account the repairs of the road and the taxes.

The contention on the part of the plaintiff is, that as the railway was sold to E. F. Kellogg for Wilson Soule by a receiver, and not by the sheriff of Ford county, the sale is absolutely void. If this be true, then there is no legal duty upon the part of Wilson Soule to repair or operate the road. If, however, the sale is not absolutely void, we do not think,

upon the showing made, that Wilson Soule, as a private person, ought to be compelled to operate the road. The Block-Pollak Iron Company cannot, under its conditional purchase of the superstructure, be compelled to repair or operate the road. There is no legal duty upon any of the other defendants to repair the road. Therefore, the question is, whether the court will compel, or attempt to compel, the railway company, a bankrupt corporation, to relay the track and repair the roadbed. The court will not make a useless or futile order. It will not do a vain thing. The order prayed for should only be issued in the interest of the public. If the track is replaced, there is no reasonable probability that the road will be or can be operated. If a railway will not pay its mere operating expenses, the public has little interest in the operation of the road or in its being kept in repair. ( Mor. Priv. Cor. 1119; *Commonwealth v. Fitchburg Rld. Co.,* 12 Gray, 180; *O. & M. Rld. Co. v. People,* 30 Am. & Eng. Rld. Cases [Ill.], 509; *People v. A. & Vt. Rld. Co.,* 24 N. Y. 261.)

The average life of cedar ties — the kind used on this road — is from three to five years. All the ties laid in 1888 will soon be so much decayed as to be worthless. A large part were worthless when the track was taken up. If the track were relaid, the road would be in no reasonable condition to be used, unless new ties were furnished, and these in a few years would again become decayed and useless. The use of the road was abandoned before any part of the track was torn up. If the track were replaced, it would be of no immediate public benefit — possibly of no future benefit — because, if the railway is not operated, the mere existence of a road, not in use, is not beneficial to any one.

The peremptory writ prayed for will be denied, with costs.

All the Justices concurring.