### ROYAL TRUST CO. et al. v. WASHBURN, B. & I. R. RY. CO.

### FROST v. McLEOD et al.

#### (Circuit Court, W. D. Wisconsin. January 16, 1902.)

1. EQUITY — AMENDMENT OF DECREE OF FORECLOSURE — MANNER OF SELLING PROPERTY.

A decree of foreclosure is not final, so far as relates to the provisions therein for its own enforcement, directing the manner in which the mortgaged property shall be sold, etc.; and in such respects it may be amended at any subsequent term.

2. RAILROADS—FORECLOSURE OF MORTGAGE—JURISDICTION OF COURT.

A supplemental decree entered by a court of equity in a suit to foreclose a mortgage on railroad property, finding that the road could not be sold as an entirety, as ordered in the former decree, owing to the

fact that it was unprofitable and could not be operated so as even to pay expenses, and that the receiver had operated it at a loss, thereby creating an indebtedness, and directing him to suspend its operation, tear up the track, and sell the same, together with the equipment, for the best prices obtainable, is one which it was within the jurisdiction of the court to make, and, even if erroneous and unwarranted, is valid and binding until reversed by a court of competent jurisdiction.

**3. FEDERAL AND STATE COURTS — CONFLICT OF JURISDICTION — INTERFERENCE BY STATE COURT WITH EXECUTION OF FEDERAL DECREE.**

A state court has no power to interfere with the execution of a decree of a federal court ordering its receiver to suspend the operation of a railroad over which it has acquired jurisdiction in foreclosure proceedings, and to take up the track and sell the materials, by granting a writ of mandamus to compel the receiver of the federal court to operate the road, or by issuing an injunction restraining him from taking up the track.[1]

**4. SAME—SUITS AGAINST FEDERAL RECEIVER.**

Section 3 of Act Aug. 13, 1888 (25 Stat. 436), providing that "every receiver of any property appointed by any court of the United States may be sued in respect of any act or transaction of his in carrying on the business connected with such property without the previous leave of the court," does not authorize a state court to entertain an action against a federal receiver to prevent him from carrying out the orders of the court of which he is an officer.[2]

**5. CONTEMPT—INTERFERENCE WITH ENFORCEMENT OF DECREE — SUIT AGAINST RECEIVER.**

A federal court, in a suit to foreclose a railroad mortgage, in which it acquired jurisdiction over the property, and operated the road for a considerable time by its receiver, after entry of a decree of foreclosure ordered the receiver to cease operating the road, and to take up the rails and sell the same, with the other equipment. A number of persons, under the advice of the district attorney of one of the counties of the state, and joined by such county, brought actions in a state court against the receiver to prevent him from executing such order. Writs were issued therein and served on the receiver, enjoining him from removing the rails, and commanding him to operate the road. After serving such writs, the sheriff of the county, without any further process, but under advice of the district attorney, forcibly interfered with the work of the receiver, and took his servants engaged in such work into custody. *Held*, that all such persons were guilty of contempt of the federal court, which, in the case of the district attorney, who advised the proceedings, and the sheriff, who was an officer charged with the enforcement of the law, was most flagrant and without mitigation.

**6. SAME—PROCEEDINGS FOR PUNISHMENT—DEFENSES.**

Advice of counsel is no defense to a proceeding for contempt of court, although where the person charged with the contempt is a layman, and not an officer charged with the enforcement of the law, it may be considered in mitigation.

In Equity. Suit for foreclosure of railroad mortgage. Proceeding on petition of the receiver against sundry persons for contempt.

Horace S. Oakley, for petitioner.

H. H. Hayden, for respondents R. D. Pike, John A. Jacobs, and L. H. Lien.

H. B. Walmsley, for respondents M. A. Sprague, W. H. Lemke, Carl Hirsch, D. M. Maxcy, and A. W. McLeod.

[1] Conflicting jurisdiction of federal and state courts, see note to Louisville Trust Co. v. City of Cincinnati, 22 C. C. A. 356.

[2] Actions by and against receivers, see note to Plow Works v. Finks, 26 C. C. A. 49.

Before JENKINS, Circuit Judge, and BUNN, District Judge.

JENKINS, Circuit Judge (orally). The facts in the matter presented to the court are not greatly involved, and are substantially uncontradicted. The Washburn, Bayfield & Iron River Railway Company was incorporated in 1895, under the general laws of the state of Wisconsin, to construct a railroad from Iron River to Washburn, in the county of Bayfield. This road ran through timber land, and manifestly, from the evidence here, it depended for its profitable operation upon the timber to be gotten out of that country. Spur lines or branches were constructed from the main line into the woods, and used for the purpose of hauling timber. On or before the 1st of January, 1898, the railroad company issued its trust deed to the complainant, to secure its bonds to the amount of $535,000, payable in 20 years, of which amount of bonds $237,000 were issued, put upon the market, and disposed of. The county of Bayfield also issued its bonds, and delivered them to the company, to aid in the construction and operation of the road. These bonds of the railway company were issued on the 1st of January, 1898, and default was made in the payment of the first installment of interest accruing thereon, July 1, 1898. In December, 1898, by reason of such default, and for the purpose of foreclosing the mortgage upon the road, the trustee in the trust deed filed its bill in this court for the foreclosure of the trust deed. A receiver was thereupon appointed, by the consent of all of the parties to the suit, to take possession for the court of this road, and to operate it in the interest of all parties concerned. The receiver and his successors in office have so operated that road from that date until nearly the present time,—a period of a little less than three years. During that period the court found it necessary, for the protection of the road and for the interest of the parties, to cause to be issued receiver's notes and receiver's certificates. It would seem that, aside from the debt which the road was under to the trustee and bondholders, it must have had quite a large floating debt at the time of this foreclosure, for receiver's certificates and notes were issued to the amount of over $220,000 for obligations incurred by the receiver in the management and operation of the road during the time mentioned, and for preferred claims against the road. It would also seem that the country between the termini of this road had been largely, if not wholly, denuded of its timber, and that the road was operated at great loss, and that it has resulted that the bondholders, interested to the amount of over a quarter of a million of dollars, have abandoned all hope of receiving anything upon their debt, and that the road, in possession of this court, must be disposed of by the court merely in the hope to recover, if possible, the whole or a part of the obligations which the court, through its receiver, had incurred in the maintenance and operation of the road. On July 23d a decree of foreclosure was passed; the total obligations of the road at that time, including receiver's certificates, being $546,857. The decree provided for the sale of the road at an upset price of $225,600, which was then the amount supposed to be due for the receiver's obliga-

tions, as determined by the amended decree of July 23d, as I recall it. On October 12th, at a subsequent term of the court, an amendment to the decree was entered, which recites that the court expressly finds that it is impossible to sell the property of the railroad company as an entirety, as was adjudged by the original decree; that the road has been constantly insolvent, and a losing venture from its inception; that, although every possible effort had been made to operate the road economically and advantageously, it had been found impossible to operate the same for any length of time so as to even pay operating expenses, and that there was a deficit arising therefrom; that there is no prospect of any decrease in the losses incident to the operation of the road; that the timber along the main line of the road and its branches has been substantially cut off, depriving the road of any value, except in the value of its rails; that there are no funds available to continue the further operation of the road; that no one will loan money to the receiver for that purpose; that the rails, motive power, rolling stock, and equipment are constantly depreciating in value, and that the longer a sale is delayed, the less will be realized, and that there is no such public interest or business in the territory through which said road passes as will support the railroad, or justify any one in advancing any money to operate it, and that, if the railroad property is held intact, it will mean simply absolute loss of the capital therein invested; that it is impracticable and injudicious to attempt to sell the property at public sale, or for the court to decree any public sale; and that, in the opinion of the court, no such sale should be ordered. Therefore the court ordered that the special master, Mr. Frost, who is receiver, be directed to proceed to take up the rails and fastenings of the road, and get the same ready for immediate sale; and he was authorized and directed with all reasonable diligence to sell for cash all of the rails, motive power, rolling stock, equipments, machinery, tools, furniture, and fixtures, and all other personal property of every kind now in his hands, except the property theretofore ordered to be turned over to the Pike Lumber Company and the American Car & Foundry Company, and that it be sold in such quantities as the special master, according to his judgment, may determine, at public or private sale, for the best prices that can be obtained for the same, and return the money into court. Subsequently to that decree, and on the 13th of December, the respondents Pike, Sprague, Jacobs, Lemke, Hirsch, Maxcy, and also Bayfield county, acting through its district attorney, Mr. McLeod, filed in the circuit court of the county of Bayfield a petition for a writ of mandamus to compel the receiver to operate this road, and substantially to refrain from carrying out the decree of this court of October 12th. That suit was disregarded by the receiver, and subsequently a peremptory writ issued on the judgment of the circuit court for the county of Bayfield, which modified in some respects the alternative writ; reciting, however, as did the original petition and the alternative writ, all the proceedings had in this court with respect to the foreclosure of the mortgage or trust deed. This peremptory writ enjoined and

required this receiver that he, without delay, continuously maintain the main line of the Washburn, Bayfield & Iron River Railway Company; that he maintain the track in a reasonable condition for use in the operation of it as a railroad; and, in substance, that he refrain from doing that which the decree of this court of October 12th required him to do. On the 23d of December a suit in equity was also commenced by the same parties in the same court against the receiver, and an order of injunction was obtained ex parte, enjoining the defendant in that suit,—the receiver in this suit,—in effect, from carrying out the orders of this court in respect to the manner of disposition of this railroad. In January of the present year the receiver proceeded to execute the decree of this court, and, by his servants, to take up the rails, with a view of marketing and selling them. It is estimated, I perceive, from proceedings here, that those rails at the present market price would bring in the market something like $140,000 or $150,000, and the avails can be used in part payment of the receiver's obligations. He was met in the attempt to execute the decree of this court by the forcible resistance of the defendant Lien, who is the sheriff of the county of Bayfield, and prevented by force from the execution of the decree as directed by the court. Thereupon this proceeding was instituted by the receiver, by his petition, seeking to punish all these parties for contempt,—as to the parties named, for the institution of the suits against the receiver; and as to Mr. Lien, the sheriff, for his forcible resistance to the attempted execution of the decree. The answers of the defendants, except the sheriff, say that their only act was the institution of the proceedings in the court, and that in so doing they acted on the advice of counsel, and believed they were right; counsel advising them that this decree of October 12th was absolutely void. The sheriff says that, in thus forcibly resisting the officer of this court in the execution of the decree of this court, he acted upon the advice of the district attorney, Mr. McLeod, who is one of the respondents here, and that he prevented the receiver from so acting under and by virtue—this is the justification for his conduct—of the said peremptory writ of mandamus, and the said injunction so in his hands for service, and by virtue of the further fact that they were committing in his presence a crime against the state of Wisconsin and its laws, and contrary to the provisions of section 4386 of the Revised Statutes of Wisconsin. It is further asserted by the parties that the decree of October 12th was absolutely void: First, because it was made and entered at a term subsequent to that at which the original decree was entered, and the court was without power; secondly, that the abandonment of the operation of the road operated to turn this property—the rails and ties and the rolling stock—over to the state of Wisconsin, the road being a public highway.

As to the first objection,—that this decree was entered at a subsequent term, and was without authority,—assuming that any one but the parties to the suit and their privies may raise the objection, the court is of opinion that the objection is not well founded. A decree of foreclosure is, in a sense, a final decree, adjudging the

rights of the parties as between themselves, but a decree of foreclosure is something more than that. It is not only a decree adjudging those rights, but is also a sort of equitable execution, providing the manner in which the decree shall be enforced, and for the assertion of the rights declared; and the provisions of a foreclosure decree with respect to the manner and the terms of the sale are part of the terms of the execution of the decree, and not of the decree, so far as adjudging the rights of the parties. There is no vested right in the party to a suit to have execution of the decree for the enforcement of his right performed in any particular manner. It is within the province of a court of equity to determine how and in what manner its decree adjudging the rights shall be carried out so as to render restitution. It is always within the province of the court of equity at any term of the court to modify the terms of a decree so as justly and equitably to enforce its judgment, and render to the parties that to which they are entitled.

An interesting and important question is suggested by the proposition that, upon the abandonment of operation of a railroad, the property—the rails, the rolling stock, engines, and equipment—of the road passed to the state, upon the theory that it is a public highway. In support of that doctrine,—which at first blush seems startling and novel, because the state of Wisconsin has authorized railroad companies to mortgage their property and to issue their bonds, and for the foreclosure of all such mortgages, and for reorganization of the road by the owners of the bonds,—they insist that the doctrine is maintained by a decision of the supreme court of Pennsylvania, rendered by no less a distinguished jurist than Judge Black. Railroad Co. v. Casey, 26 Pa. 287. If that decision is fully applicable here, it certainly is entitled to great weight as the expression of a distinguished jurist, although it is proper to say that the decision was by a divided court, of three to two; one of the dissentients being a no less distinguished jurist than Judge Woodward. But there the road had, under the act, for one of its termini, the city of Erie, and it was sought in a way to pass by the city of Erie, and make the road a connecting link with a road to the West; and the legislature repealed its charter, and appointed an agent to take possession of the property and operate it as a public highway; and an injunction was sought, which injunction was denied; and finally an act of the legislature was passed restoring the railroad company to its former rights, under certain conditions; and the bill was still prosecuted, after the complainant had been put into possession under the act of the legislature, for the profits arising from the operation of the road by the agent of the state, and that right was denied by the court. There are some expressions by Mr. Justice Black in that opinion which are, as were most of his opinions, couched in strong and vigorous language, and which seem, in a measure, to support the contention of counsel. There are, however, other decisions, which have more or less bearing upon the proposition, to the effect that the courts would not undertake to compel a railroad company to operate a railroad at a loss

(Com. v. Railroad Co., 12 Gray, 180, and Ohio & M. R. Co. v. People, 120 Ill. 200-208, 11 N. E. 347), and one from the supreme court of Kansas (Kansas v. Dodge City, M. & T. R. Co., 53 Kan. 329-336, 36 Pac. 755, 24 L. R. A. 564) which maintains the right, where a railway company was insolvent and had disposed of its road, the operation of which had been abandoned, of the purchasers to take up the rails. I do not find it necessary, nor is it possible for me within the time that has been permitted me in this discussion, to come to a fixed conclusion upon that important and interesting question. There is somewhat of a conflict between the authorities, and it is a question of importance. It is not needful to here determine the question. This road was in the possession and custody of this court. The res was here,—here with the court for its management and operation and sale. The jurisdiction of this court was complete over this road. It had jurisdiction to determine when it should be sold, and how it should be sold; and if it was improper for the court to order the rails to be taken up and sold; if its decree was improvident, and failed to recognize the supposed right of the state and the public in the road; if it was the duty of the court, under the circumstances, to keep those rails there, notwithstanding the road could not be sold, and that no one would purchase it for the purpose of operation,—still, as the late Chief Justice Ryan once observed, if it was an error, the court had jurisdiction to commit the error. That decree was valid and binding until it was reversed by a court of competent jurisdiction. So that, as the court views this case, it stands in the position of a decree of this court, valid, authorized, which should be respected and obeyed by all who are bound by it and by all who have knowledge of it.

It is to my mind—and I regret to be compelled to refer to the subject—a matter of astonishment that the distinguished jurist who presides over the circuit court for the county of Bayfield could by any possibility have issued such a judgment and writ and order of injunction as are here presented. I cannot but believe that he was either deceived in the issuance of the writ and order, or labored under gross misapprehension of his duty. If there is one principle of the law which should be known to all lawyers, which is absolutely essential to the preservation of order in society, and to the enforcement of the rights of parties, it is that the final decree of a court having jurisdiction shall not be interfered with by any other court. These parties saw fit to invoke the supposed aid of that court. With the exception of Mr. McLeod, they were all laymen. They claimed to be interested, as taxpayers of Bayfield county, and as merchants, in having that road maintained. I do not know if they supposed they had a right to have the railroad company or its bondholders or its receiver operate the road at a loss for their benefit; but, whatever their motive, the saw fit to invoke the supposed aid of that court, and to obstruct and hinder and resist the receiver in the execution of the decree of this court. It is said that they had a right to sue the receiver in that court, and they base their right upon section 3 of the act of congress of August 13, 1888 (25 Stat. 436), which is:

"That every receiver of any property appointed by any court of the United States may be sued in respect of any act or transaction of his in carrying on the business connected with such property, without the previous leave of the court in which such receiver was appointed; but such suit shall be subject to the general equity jurisdiction of the court in which such receiver was appointed, so far as the same shall be necessary to the ends of justice."

As I remarked during the argument, the history of that provision is well known. Before that act the receiver of a railroad, standing in the shoes of the railroad corporation, operating the road, incurring indebtedness, incurring obligations with respect to the carriage of property and persons, and subject to liability for accidents upon the road, could not be sued, except by leave of the court, even in the court which appointed him. The consequence was that, with respect to a road running through a great extent of country, persons having lawful and just claims against the receiver, either for property sold him, or for wrongs suffered through the operation of the road, were obliged to go to a great distance, and to resort to the court having jurisdiction of the matter. That was found to be burdensome to litigants, and so it was provided that, with respect to such claims (for you will observe the language of the act, "may be sued in respect of any act or transaction of his in carrying on the business connected with such property"), he may be sued in any court of any jurisdiction which could properly assume jurisdiction under any circumstances, and have his right determined. The execution of that judgment was not according to the ordinary forms of execution of judgments rendered by such court, but that judgment must be brought into the court of original jurisdiction, and satisfied by that court out of the funds in the possession of that court; courts of original jurisdiction recognizing, by comity, the action of other courts in adjudging the claims. But the statute most certainly has no reference to a suit brought to direct the receiver or special master to disobey the decree of the court which specifically directed him to do certain things. It most certainly was not designed to permit a state court to render nugatory the decree of the federal court having jurisdiction, by enjoining the officer of the federal court from executing the decree of the court under whom he was acting; for that is simply to bring about anarchy, and to render the administration of justice a travesty. I cannot but think, therefore, that the action of these parties in instituting these proceedings was a resistance to the decree of the court. They knew of it. They set the entire proceedings forth in their petition for this writ. They say to this circuit court of Bayfield county:

"The circuit court of the United States for the Western district of Wisconsin has decreed thus and so. We insist the decree is void, and we ask you to prevent and enjoin the officers of the federal court from carrying out the instructions of the federal court, and the decree of that court."

But they say that they were advised that this decree was void,—advised by their counsel, one of whom verified this petition to that court. This is no justification, although it may be matter of mitigation. The advice of counsel to a party that he may commit a crime

is no sort of defense. The advice of counsel that a party may set himself up in judgment against the decree of the court is no justification for resisting and violating the decree of that court. That could not be tolerated, because then no decree of court could be enforced.

The action of the other two respondents, the sheriff and Mr. McLeod, stands upon different footing. The sheriff made actual, forcible resistance to the execution of this decree. He seeks to justify his conduct, but he seems somewhat doubtful upon what ground to justify it, for he first pleads justification under the peremptory writ of mandamus; secondly, under an order of injunction that was in his hands for service; and, thirdly, under a statute of the state of Wisconsin which forbids a person from taking up a spike or rail or in any way injuring any railroad. As to his first excuse, he had no more to do with that peremptory writ of mandamus, as it was called, than a child, and it was a matter with which he was not concerned. He had no more to do with that order of injunction, except to serve it upon the parties, than a child. He had no right to set himself up as judge and executioner. He had no right to determine whether these parties were violating the orders of the circuit court of Bayfield county. He had no writ from any court commanding him to interfere with the execution of the decree of this court. This writ—this order of injunction—ran to this receiver. If he violated the lawful order of the circuit court of Bayfield county, he was responsible to that court, and the sheriff had no right of interference. Nor does the statute invoked have any reference to any such case as the present. It seeks to punish one who for a wicked purpose should interfere with the operation of a railway, and make possible the destruction of life or property, by maliciously taking up a spike or rail, seeking to destroy life or property. It had no reference to the act of an owner, or one lawfully taking up a rail. The conduct of the sheriff is without justification or mitigation, except that he says he acted upon the advice of Mr. McLeod; and that, as I have said with reference to the other respondents, is no justification. Whether in his case it may be considered even in mitigation is to my mind extremely doubtful. Here was an officer of the law, bound to respect and to execute the law,—bound to confine himself to the legitimate exercise of his powers,—undertaking, without writ and without warrant, to obstruct and resist the process of the law issued from this court; of his own motion, except as he acted under the advice of the district attorney, surrounding himself with a posse of deputy sheriffs to prevent the execution of the decree of this court. He knew—he was bound to know—that he ought not to follow such advice. He was bound to know that no advice to resist the law could shield him in the performance of the acts which he did. He arrested the servants of this receiver,—carried them 30 miles away,—as he asserts, for violation of the injunction, of which they had not been convicted, with which they had not been charged in court, and held them to bail. Who held them, and for what they were held, and under what sort of statute or law, the answer is silent, and the fact does not appear.

With respect to the case of Mr. McLeod. He also was an officer of the court, a member of the legal profession, counsel learned in the law, representing one of the divisions of sovereignty of the state of Wisconsin. He knew the sanctity of judgments and decrees. He knew that which was due to a court; and he and the sheriff—officers of the law—set a bad example to the community when they undertook to set up their judgment against the decree of a court of record and to counsel, and advise forcible resistance to the execution of that decree. He seems to have advised all these proceedings. He joined in the petition for a peremptory writ; he verified the petition; he boldly sets up the decree of this court, and assures the circuit court of Bayfield county that, in his judgment, that decree is void; and therefore he advises the sheriff, as the sheriff states, to make forcible resistance to that decree, and the latter acts thereon. I have no sort of question, without reference to the other question, whether the decree of this court of October 12th was erroneous— I have no sort of question that here has been a flagrant resistance to the decree of this court, and one that cannot be passed over; for, if a decree of a court is not to be binding, is not to be respected, is not to be obeyed, and the court does not enforce obedience and respect, we might as well abolish all courts, adopt the theories of the anarchist, and allow every man to judge for himself, to decree for himself, and to execute his own decrees. If we are to have a government of law, a government of order, if society is to be protected, men must learn that the decree of a court is not mere waste paper; that it is to be enforced; that it is to be obeyed and is to be enforced, if necessary, by the strong arm of the government.

With respect to these men who, so far as the record shows, simply attempted to resist the decree of this court by undertaking to annul its decree by applying to another court, I have doubted somewhat as to the extent of the punishment which would be adequate. I have sought to look at their conduct leniently. I have considered they were laymen. I have considered that they were, in a sense, interested as taxpayers, and had, perhaps, a strong interest that this road should be maintained. I have sought to consider and to recognize the weakness of human nature, and that they have allowed their feelings to run away with their judgment. I have come to the conclusion, as to them, that a fine of not a large amount would be sufficient in the present case. And the judgment of the court as to them will be that each of them—there are six of them— be fined, for the contempt it is found they have committed, in the sum of $250, and that each of them be imprisoned in the county jail of the county of Dane until such fine be paid.

With respect to Mr. McLeod and the sheriff, Mr. Lien, the court cannot deal with them upon the same basis. There has been in their case flagrant and unwarranted resistance to the decree of this court, and that by parties who knew better, whose education taught them better, whose position demanded of them respect of the judgment of the court, not forcible resistance to it. It is a very sorry sight for a district attorney of a county, and a member

of the legal profession, to advise any one to forcibly resist the decree of the court. It is a very bad example to the community when the sheriff of the county, the executive of the law, seeks to take the law into his own hands, and to give defiance and forcible resistance to a court established by the government of the United States. I cannot pass over that conduct with a fine. In their case—the case of McLeod and the case of Lien—the judgment of the court will be, for the contempt which they have committed, and of which they are respectively convicted, that each of them be imprisoned in the county jail of the county of Dane for the period of 60 days.

I trust that this will be the end of forcible resistance to this decree. I trust that those who recognize the situation will see to it that the time for forcible resistance to the law is passed,—will see to it that, whatever rights the state of Wisconsin may have, and whatever rights these parties may have, they are not to be obtained by defiance of a decree of the court. If any error has intervened in the proceedings of this court, there are methods in the courts of the land by which such error may be corrected, but it cannot be tolerated that there shall be forcible resistance to a decree of a court.